**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **SHARON SWECKER,** | : | |
| **Plaintiff,** | : | **Case No. 08-cv-746** |
| **v.** | : | **Judge Holschuh** |
| **DUBLIN CITY SCHOOL DISTRICT,** et al., | : | **Magistrate Judge Kemp** |
| | : | |
| **Defendants.** | : | |
| | : | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

This case has been brought by Sharon Swecker, a former employee of the Dublin City School District, for allegedly wrongful actions taken against her in early 2005, when Swecker was the subject of an investigation into missing funds at the School District. The defendants are the Dublin City School District and two individuals in their capacities as officials of the School District, William O. Mulbarger, the Executive Director of Human Resources, and Jeff McCuen, the Assistant Treasurer of the school district. Swecker has brought four claims overall: defamation, wrongful discharge, negligence, and a § 1983-based claim for denial of due process in violation of the Fourteenth Amendment. The defendants have moved for summary judgment on all of these claims. For the reasons that follow, this motion is granted in part and denied in part.

**I.  Background**

Sharon Swecker was hired as a receptionist in the central office of the Dublin City School District in 1988. She became an administrative secretary in the Human Resources ("HR") Department in 1995, and by all accounts she performed well throughout her tenure, up until, that is,

1

she was suspected of having taken money from the school district's fingerprinting fund.

Ohio law requires all school district employees to be fingerprinted, and the HR Department performs this service for school district employees for a fee. Fingerprints are processed through the Ohio Bureau of Criminal Investigation ("BCI"), the Federal Bureau of Investigation ("FBI"), or both, depending on the circumstances of the applicant. In addition, the fee is different for the two—$15 for a BCI check and $24 for an FBI check. At all times relevant to this lawsuit, only cash was accepted for fingerprints at the district. It was stored in an envelope in the Human Resources File Room, which could only be accessed by HR employees and was locked at night. Periodically, the money would be counted and taken, along with the receipts generated for each individual and a certificate, to the Treasurer's Office. Four different individuals in the office were responsible for taking the prints, one of which was Swecker, and Swecker took responsibility for delivering the receipts and the money to the Treasurer's Office beginning in 2001.

In the first week of January in 2005, while Swecker had taken time off from work, a substitute teacher in the school district came into the HR Department and wanted to pick up copies of her fingerprint certification. Although she knew that she had been fingerprinted for checks by both the BCI and the FBI the previous August, HR employees were able to locate only a certificate for the BCI check; no record of the FBI check could be found. Because of this disparity, employees in the HR department looked further into what might have happened, and they found that fourteen other individuals had been fingerprinted on the same day as the substitute teacher, Wednesday, August 11, 2009, yet the records in the Treasurer's Office showed that only one receipt and $15 were collected that day. This seemed especially odd because Wednesdays in August were typically quite busy fingerprinting days.

2

Concerns therefore grew that someone might have been taking money from the fingerprinting fund. And although, as mentioned, all HR employees had access to the room in which the money was kept, Swecker was the natural object of these concerns because she was primarily responsible for counting the money and taking it to the Treasurer's Office. As more discrepancies were found between HR records of how many fingerprints had been taken and the Treasurer's records of receipts, Defendant Marburger, the Executive Director of HR, decided to spend time observing who went in and out of the HR file room where the money was kept. So at 1:15 p.m. on January 12, 2005, while Swecker was still at lunch, he counted the money in the envelope and saw that it had $135 in cash and receipts for $159 worth of fingerprints. He then kept an eye on the file room from 1:15 p.m. to 4:30 p.m. During this time, only Swecker went into the room, and after she left work for the day, Mulbarger checked the envelope again, this time finding that it contained only $15 and one receipt.

With his suspicions starting to solidify into evidence, Mulbarger contacted Defendant McCuen in the Treasurer's Office, and told him what he had observed. McCuen then had Brian Kern begin a more expansive investigation into the receipts and monetary deposits over the previous few years, which showed large discrepancies. McCuen also had two cameras installed in the file room and a third installed in the ceiling over Swecker's desk. On January 19 and 20, 2005, these cameras tracked Swecker as she handled the envelope with the fingerprinting money, and according to the defendants' motion for summary judgment, Swecker was seen on camera placing what McCuen believed to be receipts into the trash can and taking money. Furthermore, after January 20, money and receipts were found missing. As a result, the custodian for the office was instructed not to empty the trash cans in Swecker's area that night so McCuen could see whether they contained the missing receipts. Toward the end of the day on January 20, two of Swecker's co-workers noticed that the

trash cans were not emptied at their usual time, so Swecker asked the custodian why that was. According to Swecker, the custodian told her that she had been told not to get trash from HR. Upon hearing this, Swecker returned to her office and was seen on camera taking papers out of her trash can and putting them into an envelope, before walking out. The exact nature of these papers has not been determined, but McCuen believed them to be receipts for money received for fingerprinting. Swecker, however, claims that they were not receipts; they were merely related to some personal research she had improperly done on her work computer—research on Housing and Urban Development homes for her sister. It is this, she claims, that she did not want HR officials to find.

A few days later, on January 24, 2005, Mulbarger found that Swecker was shredding a large amount of documents. He was also told that Swecker had made an additional deposit with the Treasurer's Office in which the money deposited did not match the receipts. As a result of this, Mulbarger placed Swecker on paid administrative leave immediately; he had her return her key to the office and she was escorted from the building.

While Swecker was on paid administrative leave, Mulbarger told her that, because it was paid leave, she needed to be available by phone at all times during work hours. He also told her that she should resign. In fact, according to Swecker, Mulbarger called her at home three to four times a day to request her resignation. He claims that he told Swecker that she would be provided with a termination hearing if she chose not to resign, at which he would recommend to the school board that she be fired, but Swecker denies she was ever told of the right to a hearing. Mulbarger also claims that his calls to Swecker were only for the purpose of determining whether he would have to schedule a termination hearing. In any event, perhaps seeing the writing on the wall, Swecker submitted her resignation on February 1, 2005.

4

Also in late January, Swecker claims that McCuen made a defamatory statement against her. She says that McCuen, when discussing the allegations against her, told another School District employee, Susan Closson, that "Sharon's guilty. Why doesn't she just admit it?" In April of 2006, Swecker wanted to know whether the School District was giving her bad references as she applied for new jobs, so she hired a reference investigation company to perform a reference check. On April 26, 2006, Mulbarger received a call from this company, and Swecker claims that he made several defamatory statements about her in the course of giving a negative reference.

Swecker filed suit in state court in May 2008, with an Amended Complaint on July 7, 2008. The case was then removed to this Court on August 1, 2008. Count One is for defamation against Mulbarger and McCuen; Count Two is for Wrongful Discharge; Count Three is for negligence; and Count Four is a § 1983 claim for deprivation of her right to due process. Defendants filed the present Motion for Summary Judgment on December 4, 2009.

## II. Applicable Law

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting FED. R. CIV. P. 1). The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial, . . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really

5

have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)). See also Lansing Dairy, Inc. v. Espy, 39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried. Lashlee v. Sumner, 570 F.2d 107, 111 (6th Cir. 1978). The court's duty is to determine only whether sufficient evidence has been presented to make the issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law. Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003). All the evidence and facts, as well as inferences to be drawn from the underlying facts, must be considered in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986); Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001). Additionally, any "unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157–60 (1970).

"[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson</u>, 477 U.S. at 247–48 (emphasis in original). A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties." <u>Kendall v. Hoover Co.</u>, 751 F.2d 171, 174 (6th Cir. 1984). <u>See also Anderson</u>, 477 U.S. at 248. An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. <u>See also Leary</u>, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322. The nonmoving party must demonstrate that "there is a genuine issue for trial," and "cannot rest on her pleadings." <u>Hall v. Tollett</u>, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is insufficient; there must be evidence on which the jury could reasonably find for the opposing party.

Anderson, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Phillip Morris Companies, Inc., 8 F.3d 335, 340 (6th Cir. 1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. Anderson, 477 U.S. at 251–52; Lansing Dairy, Inc., 39 F.3d at 1347.

## III.    Analysis

### A.    Defamation

In her defamation claim, Swecker alleges that Mulbarger "either intentionally lied or wantonly and recklessly disseminated false information about the Plaintiff." Am. Compl. at ¶ 24. Specifically, Swecker complains of the negative job reference that Mulbarger provided to the reference investigation firm. Id. at ¶ 25. And with respect to McCuen, she argues that he has a duty not to state his suspicions as true statements. Id. at ¶ 28. This presumably refers to the comment McCuen made to coworkers in January 2006 about Swecker's guilt.  She alleges that, as a result of this comment, she "suffered a loss of reputation for honesty and she was subjected to ridicule and contempt." Id. at ¶ 29.

The parties agree that Ohio law applies to this claim. In Ohio, defamation comes in two forms: libel and slander. Sweitzer v. Outlet Communications, Inc., 133 Ohio App. 3d 102, 108 (Ohio Ct. App. 1999). Slander usually refers to spoken defamatory words while libel refers to the written form of defamation. Id. "The essential elements of a defamation action are that the defendant made a false statement, that the false statement was defamatory, that the false defamatory statement was published, that the plaintiff was injured, and that the defendant acted with the required degree of

fault." Id. In addition, truth is an absolute defense to defamation, see OHIO REV. CODE § 2739.02, and opinions are constitutionally protected under the Ohio Constitution, Vail v. The Plain Dealer Publishing Company, 72 Ohio St. 3d 279, 281 (Ohio 1995).  To determine whether a statement is one of fact or one of opinion, the Court should consider "the specific language used, whether the statement is verifiable, the general context of the statement, and finally, the broader context in which the statement appeared." Id. at 282. Yet this test is more "fluid" than a bright-line test; "[e]ach of the four factors should be addressed, but the weight given to any one will conceivably vary depending on the circumstances presented." Id.

Defendants move for summary judgment on this claim for several reasons. First, they argue that because Mulbarger's statements consisted of mere opinions and accurate factual details, they are unactionable. With respect to McCuen's statement—"Sharon's guilty, why doesn't she just admit it"—Defendants argue that the statement is substantially true. They also argue that Swecker has no direct evidence that McCuen made this statement.  He denies making it and Swecker's evidence of it—that Dublin Schools employee Susan Closson told her that McCuen made this statement—is double hearsay.

Swecker responds by arguing that McCuen's statement is not hearsay because it is a "verbal act," and is therefore not being offered to prove the truth of the matter asserted. Instead, she says, it is being offered merely to prove that a slanderous statement was made. She also argues that his statement falls within the "party-opponent admission" exception to the hearsay rule, found in FED. R. EVID. 801(d)(2). Third, Swecker argues that although statements that are substantially true may not be actionable as defamation, whether a particular statement is substantially true is normally a question of fact, and here, she says, whether "Sharon's guilty" is substantially true is a material fact

9

in dispute for a jury to decide. Swecker also points to ways in which the factual support for McCuen's statement is faulty.

Defendants, in turn, argue that even if McCuen's statement is not, itself, hearsay, Closson's statement is. Her statement, made to Swecker, was that McCuen had said "Sharon's guilty, why doesn't she just admit it?" Swecker, they say, does seek to prove the truth of the matter asserted in Closson's statement—that McCuen did make that statement to her about Swecker. Furthermore, defendants challenge Swecker's argument that Closson's statement fits within the "statement against interest" exception to the hearsay rule. Specifically, they disagree with Swecker's contention that Closson can be seen as an agent of the Board of Education, and they point out that even if she could, the Board is not charged with defamation. Finally, they argue that the statute of limitations on a defamation claim in Ohio—one year—has run, at least against McCuen because the statements he allegedly made were made shortly before Swecker resigned on February 1, 2005.

Defendants also point out that Swecker did not respond to their arguments regarding Mulbarger. The Court believes that summary judgment is appropriate on this claim with respect to Mulbarger. Defendants are correct in their assertion that his statements in the phone call with the reference-checking agency are either of undisputed facts or constitutionally protected opinion. In the phone call of which Swecker complains, Mulbarger, only after being asked, gave his honest opinion of Swecker's time as a school district employee. Mulbarger stated as follows:

> Q)    Can you verify that Sharon Swecker worked for Dublin City Schools from 6/88 to 2/1/05?
> A)    Yes Madame
>
> Q)    Were you her supervisor?
> A)    Part of the time, she was there before me.
>
> Q)    What was her title Human Resources Administrative Secretary?

A)      Correct grade 5

Q)      Sharon has described that she was responsible for—answer phones, BCI/FBI
        fingerprints . . . all Employee ID's. Send reject letters to unsuccessful
        candidates. Handled all substitute teachers on a daily basis. Set up and got
        approved by the Board of Education. Is this accurate or inaccurate?
A)      That's fair

Q)      Did she meet the position's performance requirements?
A)      Yes, I would say it was satisfactory

Q)      What was the reason for the separation of employment?
A)      Resigned

The following questions require you to rate her performance on a scale of 1–5
with 5 being excellent and 1 being unsatisfactory; how would you rate Sharon's—

|  |  |
|---|---|
| Knowledge of the position and its responsibilities: | 3 |
| Professional conduct: | 1 |
| Problem-solving abilities: | 3 |
| Time Management and organizational skills: | 2 |
| Written communication skills: | 2 |
| Oral communication skills: | 4 |
| The quality of her work: | 3 |
| Work ethics and moral integrity: | 1 |

Q)      What were her strongest skills as an employee?
A)      Very friendly on the telephone.

Q)      Were there areas of her performance that needed improvement?
A)      Yes Madame, don't want to go there.

Q)      Was she a team player?
A)      No

Q)      Was she able to form and maintain positive relationships with her
        supervisors and co-workers?
A)      Some

Q)      Have there been any complaints made or internal investigations, which
        resulted in disciplinary action?
A)      Yes, some yes.

Q)      Did she meet your company's attendance requirements?

A)     That was on evaluation—was getting better, 1 year she was on probation.

Q)     If you were responsible for hiring would she be eligible for rehire?
A)     Absolutely not

Q)     Would you recommend Sharon for a similar position?
A)     I think you can take off of my previous answers.

Q)     Would you recommend her for an Executive Secretary/Special Education Department position?
A)     Again, I think you can take off of my previous answers.

Q)     Are there any additional comments you would like to add concerning Sharon's employment with your company?
A)     No Madame

Q)     Could you refer me to her former supervisor or someone else within your organization that could evaluate her job skills?
A)     I'm an Executive, no one higher in department.

Doc. 23-3 at 13–14. Putting aside those statements that are conveying only basic employment information, the Court concludes that, under the Vail test, which, as mentioned, requires courts to consider "the specific language used, whether the statement is verifiable, the general context of the statement, and finally, the broader context in which the statement appeared" Vail, 72 Ohio St. 3d at 282, the remainder of these statements are entirely opinion. His rankings of her performance are clearly made in a context that calls for his opinion, and they are not subject to verification. The same is true about his statements as to whether she needed improvement in certain areas, whether she was a "team player," whether she had positive relationships with her co-workers, and whether he would rehire Swecker or recommend her for other employment. Each of these statements can only be true in the eye of the person making them. And read in context, each question calls for an opinion. Plus, in the broader context, the statements were all made during a phone call from a reference-checking agency; by definition, obtaining Mulbarger's opinion of Swecker was the primary goal of the call.

12

As a result, the Court concludes that Mulbarger's statements are all constitutionally protected opinions, and they therefore cannot be considered in Swecker's defamation claim. Because there are no other statements of which Swecker complains, Mulbarger has met his burden on summary judgment. And because Swecker has provided no response to these arguments, she has failed to meet hers. Summary judgment is therefore appropriate on this claim.

The same is true for Swecker's defamation claim against McCuen concerning his statement that "Sharon's guilty, why doesn't she just admit it?" The evidence of this statement comes in a less-than-direct form: Swecker alleges that McCuen made the statement to Closson, who then told Swecker. This "she told me that he said" chain of statements would ordinarily raise the specter of double hearsay, and in such situations, "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in [the Federal Rules of Evidence]." FED. R. EVID. 805 (emphasis added).

There is no double hearsay here.  McCuen's statement is not hearsay because it is not being offered for the truth of the matter asserted. In fact, Swecker offers it for precisely the opposite reason—she believes it was false. As a result, it is being offered only to prove that he made the statement—a "verbal act"—and it therefore is not hearsay. See FED. R. EVID. 801 advisory committee's note to subsection (c) ("If the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay. . . . The effect is to exclude from hearsay the entire category of "verbal acts" and "verbal parts of an act," in which the statement itself affects the legal rights of the parties . . . ."); Preferred Properties, Inc. v. Indian River Estates, Inc., 276 F.3d 790, 799 n.5 (6th Cir. 2002) ("The verbal acts doctrine applies where 'legal consequences flow from the fact that words were said . . . .'") (quoting

BLACK'S LAW DICTIONARY 1558 (6th ed. 1990)).

Closson's statement, however, is hearsay. Swecker seeks to prove exactly what Closson told her—that McCuen did, in fact, say "Sharon's guilty, why doesn't she just admit it?" Swecker claims that it fits within the party-opponent admission exception to the hearsay rule, contained in FED. R. EVID. 801(d)(2), which provides that a statement is not hearsay if:

> The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.

But this rule does not apply to Closson's statement. Rule 801(d)(2) cannot apply directly to Closson's statement because she is not a party. Second, if, as Swecker argues, Closson were an "agent or servant" of the School District, Rule 801(d)(2) still would not apply because, even though the School District is a party to the lawsuit, the Rule requires that the party whose agent made the statement is also the same party against whom the statement is offered. See Stalbosky v. Belew, 205 F.3d 890, 894 (6th Cir. 2000) ("Under Rule 801(d)(2)(A), a party's statement is admissible as non-hearsay only if it is offered against that party.") Here, the statement is being offered only against McCuen, so to be admissible under Rule 801(d)(2), the statement must be either his or that of his agent or servant. There is no allegation that Closson is McCuen's agent. Consequently, the statement remains hearsay and is therefore inadmissible to support this claim. Accordingly, summary judgment on this claim is appropriate in favor of McCuen.

### B.    Wrongful Discharge

Swecker claims in Count Two of her Amended Complaint that she was constructively discharged in violation of public policy. Am. Compl. at ¶¶ 31–36. Defendants argue, however, that the tort of wrongful discharge in violation of public policy only applies in the context of at-will employment relationships, and because Swecker was not an at-will employee, summary judgment is appropriate on this claim. Motion at 10–11 (citing Greeley v. Miami Valley Maintenance Contractors, Inc., 49 Ohio St. 3d 228, 233–34 (Ohio 1990); Painter v. Graley, 70 Ohio St. 3d 377, 385 (Ohio 1994); and Haynes v. Zoological Society of Cincinnati, 73 Ohio St. 3d 254, 258 (Ohio 1995)). Swecker has not responded to this argument, perhaps because she does agree that she is a civil service employee, not an employee at will. Opp. at 10. Summary judgment is therefore appropriate as a matter of law because Swecker was not an at-will employee.

### C.    Negligence

Swecker's third claim is for negligence. She claims that defendants "had a duty to refrain from negligently and improperly identifying Plaintiff as being the perpetrator of a criminal offense[, and that they] provided false information to the authorities that the Plaintiff had committed a crime in violation of their legal duty to the Plaintiff." Am. Compl. at ¶ 39. This stems, she says, from the way in which "[t]he allegations against Plaintiff were made public and several newspapers printed the allegations against her." Id. at ¶ 38.

Defendants argue that they are immunized from tort liability under Ohio law. See OHIO REV. CODE §§ 2744.02(A)(1) and 2744.03(A)(6). The School District argues that it is immunized by § 2744.02(A)(1), which provides immunity to political subdivisons, including local school districts, see OHIO REV. CODE § 2744.01(F), "for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in

15

connection with a governmental or proprietary function." The provision of public education is a "governmental function." OHIO REV. CODE § 2744.01(C)(2)(c). There are five exceptions to this immunity, which deal with the negligent operation of motor vehicles, the performance of proprietary functions, the maintenance of public roads, negligence related to physical defects in public buildings, and situations in which liability is expressly imposed upon a political subdivision under a section of the Ohio Revised Code. OHIO REV. CODE § 2744.02(B). The School District argues that none of these sections applies, and Swecker does not rebut this argument.  Because the Court is also unable to find any facts in the record that would support the application of any of these exceptions, summary judgment in favor of the School District on this claim is therefore appropriate as a matter of law.

Similarly, Mulbarger and McCuen argue that they are immunized by OHIO REV. CODE § 2744.03(A)(6), which provides, in relevant part:

> (6) In addition to any immunity or defense referred to in division (A)(7) of this section and in circumstances not covered by that division or sections 3314.07 and 3746.24 of the Revised Code, the employee is immune from liability unless one of the following applies:
>
> > (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;
> >
> > (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner . . .;

Swecker alleges that McCuen acted recklessly when he identified her as the perpetrator of the alleged theft.  Specifically, Swecker argues that filing the incident report with the police was a "perverse disregard of a known risk," because "McCuen was aware that by implicating Ms. Swecker in a serious crime, both her social reputation and work reputation would be ruined. However, he

proceeded to do so anyway without a full understanding of the circumstances surrounding the missing money and based on limited, inconclusive evidence." Mem. in Opp'n at 8.

Mulbarger and McCuen argue that they did not act in a reckless manner. It was entirely reasonable for them to suspect Swecker of stealing money from the fingerprint fund. Mulbarger had been told that the money received did not match the receipts for fingerprinting. He spent an entire afternoon watching the room in which the money was kept, during which time he observed only Swecker entering the room, and after which time he found money missing. McCuen did more expansive research through Brian Kern on how the books matched up with money taken in. Plus, he had cameras installed in the HR Office, which showed what he believed to be Swecker taking money from the fingerprint fund and destroying receipts.

The Court agrees with defendants regarding the application of § 2744.03(A)(6)(b). It is normally for a jury to determine whether an individual's actions are malicious, in bad faith, or are wanton or reckless. Fabrey v. McDonald Village Police Dep't, 70 Ohio St. 3d 351, 356 (Ohio 1994). Nonetheless, summary judgment on this provision is appropriate where a court "conclude[s] that the record is devoid of evidence tending to show that the political subdivision employee acted wantonly or recklessly." Irving v. Austin, 138 Ohio App. 3d 552, 556 (Ohio Ct. App. 2000).

Here, the record is devoid of evidence showing that Defendants acted in a reckless manner in filing the police report. At the time McCuen filed the report, he had strong evidence indicating that Swecker was stealing money from the fingerprint fund. Mulbarger had direct evidence that money and receipts were missing from the envelope stored in the file room which only Swecker had entered on the afternoon of January 12, 2005. In addition, Swecker was seen on camera placing what looked like receipts into the trash can and taking money. Under these circumstances, no

17

reasonable jury could find that Defendants acted in a reckless manner in filing the police report. Section 2744.039(A)(6)(b), therefore, does not apply and Defendants are entitled to immunity on this claim.

### D.    Section 1983

Swecker's fourth claim is for a violation of her civil rights under the Due Process Clause of the Fourteenth Amendment, and it takes two forms. She first argues that she was deprived of her property interest in continued employment when she was constructively discharged after being placed on paid administrative leave on January 24, 2005. Next she argues that she was deprived of her liberty interest in her reputation when Mulbarger and McCuen made their allegedly defamatory statements about her after her constructive discharge.

With respect to her property-interest claim, Defendants agree that, as a permanent, civil service employee of the Dublin City School District, Swecker did enjoy a property interest in her continued employment. See Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577 (1972); Bailey v. Floyd County Bd. of Educ., 106 F.3d 135, 141 (6th Cir. 1997). As such, her interest is protected by the Due Process Clause of the Fourteenth Amendment. Cleveland Board of Educ. v. Laudermill, 470 U.S. 532, 538–39, 541–42 (1985).

Defendants argue, however, that Swecker was not deprived of that property interest because she voluntarily resigned.  Swecker counters that, given the fact that Mulbarger called her three to four times a day requesting her resignation, there is at the very least a jury question as to whether she was constructively discharged. She also claims that in these phone calls, Mulbarger never informed her that, if she did not resign, she would be entitled to a pre-termination hearing. Defendants argue in response that Mulbarger called her only "to determine whether he needed to

18

conduct [a hearing, because a] resignation would obviate any need for a hearing." Reply at 5.[1]

Therefore, they say, she was not constructively discharged. Furthermore, they argue that Swecker

did, in fact, have notice of the reasons for her discharge, which establishes that her resignation was

voluntary.

The Court agrees with Swecker. The notion that a constructive discharge from public

employment may constitute a deprivation of property entitled to due process protections is not as

firmly rooted in the Sixth Circuit as it is in others, but there is case law in this circuit, albeit

unpublished, that does recognize the concept. See Nunn v. Lynch, 113 Fed. App'x 55, 59 (6th Cir.

2004) ("A constructive discharge may constitute a deprivation of property within the meaning of the

Fourteenth Amendment."). "A constructive discharge occurs when working conditions were so

unpleasant and unreasonable that a reasonable person in the employee's shoes would have felt

compelled to resign. A plaintiff must show that the employer intended and could reasonably have

foreseen the impact of its conduct on the employee." Id. (internal citation and quotation marks

omitted).

> An apparently voluntary resignation does not rise to the level of
> constructive discharge unless it is objectively reasonable for the
> employee to leave under the circumstances. . . . [Furthermore, t]here
> are two circumstances in which an employee's resignation will be
> deemed involuntary for due process purposes: 1) when the employer
> forces the resignation or retirement by coercion or duress, or 2) when

---

[1]

Defendants also argue that Swecker has not alleged that available state procedures were
inadequate to compensate her for the deprivation of her property interest, and that, notwithstanding
any predetermination Mulbarger had made to recommend her termination at a hearing, the Board
of Education had not made up its mind, which establishes that the hearing would have been
adequate. Because these arguments are made for the first time in the Reply brief, which leaves
Swecker with no chance to respond and deprives the Court of a full discussion of the merits of the
arguments, the Court will not consider these arguments. See U.S. v. Lopez-Medina, 461 F.3d 724,
743 n.4 (6th Cir. 2006).

> the employer obtains the resignation or retirement by deceiving or misrepresenting a material fact to the employee.

Id. at 59–60. Put another way, the plaintiff must show that "the employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." Moore v. KUKA Welding Systems & Robot Corp., 171 F.3d 1073, 1080 (6th Cir. 1999). "[B]adgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation" is one factor to be considered when deciding whether the employer "deliberately created intolerable working conditions." Logan v. Denny's, 259 F.3d 558, 569 (6th Cir. 2001).

Here, there is evidence in the record that when Swecker was escorted from the building and placed on paid administrative leave on January 24, 2005, Mulbarger did not inform her of what she was accused of doing. Dep. of William Mulbarger at 35:5–14; 39:7; Affidavit of Sharon Swecker at ¶ 5. And in the week between January 24 and January 31, the date on which she mailed in her resignation, Mulbarger called Swecker "three to four times a day" to request her resignation. Deposition of Sharon Swecker at 57:22–23; see also Swecker aff. at ¶ 6. Mulbarger claims that he was merely trying to determine whether he would have to hold a hearing on Swecker's termination, Reply at 5, but Swecker claims that he simply demanded her resignation and told her that, if she didn't resign, he would recommend her termination by the Board, Swecker aff. at 58:2–8, 59–11. At no time was she provided with notice of what charges she was facing or any explanation of why she was being asked to resign. Id. This, Swecker argues, is "blatantly in violation of [her] due process rights and the Negotiated Agreement between the Dublin Support Association/OEA/NEA and the Dublin Board of Education (the "Negotiated Agreement"), which in part provides:

> [A]ny termination undertaken by the Board shall be preceded by written notice of a hearing to take place before the Superintendent or his/her designee no less than forty-eight (48) hours from the date said notice is received. Such notice shall include a statement of allegations, shall inform the employee of his/her right of representation, and shall set the time and date of the hearing.

Opp. at 11–12 (quoting Exhibit 4). In the end, Swecker contends that she was left with no option but to resign. Swecker aff. at ¶ 6.

The Court believes that, based on this evidence, and, as required, considering the evidence in the light most favorable to the plaintiff, a jury question is presented as to whether Swecker was constructively discharged and thereby deprived of her property interest in continued employment. The evidence includes Swecker's claim that Mulbarger's repeated and persistent phone calls to Swecker constituted "badgering [and] harassment . . . calculated to encourage the employee's resignation" Logan, 259 F.3d at 569. It can be argued that the alleged phone calls were "so unpleasant and unreasonable that a reasonable person in the [Swecker's] shoes would have felt compelled to resign." Nunn, 113 Fed. App'x at 59.  It also can be argued that, based on all this evidence, Mulbarger "intended and could reasonably have foreseen the impact of [his] conduct on [Swecker]." Id. In short, given Mulbarger's alleged coercion, it was "objectively reasonable for [Swecker] to leave under the circumstances." Id. at 59–60. Summary judgment on this claim is therefore denied, as the defendants have failed to meet their burden of showing that there is no genuine issue of material fact on this particular claim.

With respect to Swecker's other due process claim—that her liberty interest in her reputation was damaged when she did not have a name-clearing hearing—the Court believes that summary judgment in favor of the defendants is appropriate. "[A] person's reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause of the fourteenth

21

amendment." Quinn v. Shirey, 293 F.3d 315, 319 (6th Cir. 2002) (quoting Chilingirian v. Boris, 882

F.2d 200, 205 (6th Cir. 1989)). One becomes entitled to a name-clearing hearing if he or she

establishes the existence of the following five elements:

> First, the stigmatizing statements must be made in conjunction with
> the plaintiff's termination from employment. . . . Second, a plaintiff
> is not deprived of his liberty interest when the employer has alleged
> merely improper or inadequate performance, incompetence, neglect
> of duty or malfeasance. . . . Third, the stigmatizing statements or
> charges must be made public. . . . Fourth, the plaintiff must claim that
> the charges made against him were false. . . . Lastly, the public
> dissemination must have been voluntary.

Ludwig v. Board of Trustees of Ferris State University, 123 F.3d 404, 410 (6th Cir. 1997) (internal

citations omitted). But entitlement to a hearing alone is not sufficient to constitute a deprivation of

due process; one must also request a hearing and have that request denied: "It is the denial of the

name-clearing hearing that causes the deprivation of the liberty interest without due process. . . .

Thus, the public employer deprives an employee of his liberty interest without due process, if upon

request for a name-clearing hearing, the employee is denied." Shirey, 293 F.3d at 320 (6th Cir. 2002)

(citing Brown v. City of Niota, Tenn., 214 F.3d 718, 723 (6th Cir. 2000)); see also Brown, 214 F.3d

at 723 ("Once a plaintiff has established the existence of all five elements, he is entitled to a

name-clearing hearing if he requests one.") (emphasis added).

Defendants argue that Swecker has not been deprived of her liberty interest because she

never requested a name-clearing hearing. Swecker, in turn, argues that "[u]nder the unique facts of

this case, she should not be required to request a name clearing hearing prior to bringing suit because

the School District established its own name clearing process in the Negotiated Agreement but

forced Plaintiff to resign without notifying her of that process." Opp. at 13. She also argues that any

hearing that would have occurred would have been "a farce and would not have provided Ms.

Swecker with any true due process opportunity to clear her name since the Defendants had already irrevocably established in their own minds that she was guilty." <u>Id.</u> at 14.

The Court agrees with the defendants. The law of this circuit is quite clear that "a plaintiff who fails to allege that he has requested a hearing and was denied the same has no cause of action, whether or not he had been informed of a right to a hearing before filing suit." <u>Quinn</u>, 293 F.3d at 324. Thus, all that matters here is whether Swecker requested a name-clearing hearing, not whether she was informed of her right to one. And there is no dispute that she did not request one. Summary judgment is therefore appropriate on this claim.

## IV.    Conclusion

For these reasons, defendants' Motion for Summary Judgment (doc. 23) is **GRANTED** as to Counts I, II, and III, as well as to the liberty interest claim asserted in Count IV. Defendants' motion is **DENIED** as to Swecker's property interest claim asserted in Count IV.

**IT IS SO ORDERED.**

Date: September 22, 2010                                          **/s/ John D. Holschuh**
                                                                 John D. Holschuh, Judge
                                                                 United States District Court